# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|                                         |     |                                  |
|-----------------------------------------|-----|----------------------------------|
| **ALISA L. HOWARD,**                    | )   |                                  |
|                                         | )   |                                  |
| **Plaintiff,**                          | )   |                                  |
|                                         | )   |                                  |
| **vs.**                                 | )   | **Case No. 4:11CV 1965 SNLJ(LMB)** |
|                                         | )   |                                  |
| **MICHAEL J. ASTRUE,**                  | )   |                                  |
| **Commissioner of Social Security,**    | )   |                                  |
|                                         | )   |                                  |
| **Defendant.**                          | )   |                                  |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Alisa L. Howard for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17). Plaintiff has filed a Reply Brief. (Doc. No. 18).

## Procedural History

On August 13, 2008, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on February 1, 2005. (Tr. 234-41). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 29, 2010. (Tr. 10-17). Plaintiff

then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on September 15, 2011. (Tr. 6, 1-3). Thus,

the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§

404.981, 416.1481.

## **Evidence Before the ALJ**

### **A.     ALJ Hearing**

Plaintiff's administrative hearing was held on November 19, 2009. (Tr. 36). Plaintiff was

present and was represented by counsel. (Id.). Also present was Steve Benjamin, vocational

expert. (Id.).

The ALJ noted that plaintiff had two prior applications, which were denied prior to the

hearing and after plaintiff's alleged onset date. (Tr. 37). Plaintiff's attorney stated that plaintiff

had been unable to work since February of 2005 due to severe knee pain. (Id.). Plaintiff's

attorney indicated that the new and material evidence justifying a reopening of plaintiff's previous

applications was a new diagnosis of fibromyalgia.[1]  (Tr. 38).

The ALJ examined plaintiff, who testified that she lived in a second floor apartment. (Tr.

39). Plaintiff stated that she had laundry facilities in her apartment. (Id.). Plaintiff testified that

she lived with her daughter and her one-year-old granddaughter. (Tr. 40). Plaintiff stated that

her daughter did not work because she was disabled. (Id.). Plaintiff testified that her daughter

was mentally retarded. (Id.).

---

[1]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness,
fatigue, and sleep disturbances; the cause is unknown. The American College of Rheumatology
has established diagnostic criteria that include pain on both sides of the body, both above and
below the waist, as well as in axial distribution. Additionally, point tenderness must be found in at
least 11 of 18 specified sites. Stedman's Medical Dictionary, 725 (28th Ed. 2006).

Plaintiff stated that she was forty-eight years of age, and graduated from high school. (Tr. 40-41). Plaintiff testified that she had a CNA license. (Tr. 41).

Plaintiff stated that she last worked in February of 2005, as a CNA at a nursing home. (Id.). Plaintiff testified that she had worked as a CNA since 1986 or 1987. (Id.). Plaintiff stated that she stopped working due to problems with her legs and knees. (Id.). Plaintiff testified that she was terminated. (Tr. 42).

Plaintiff testified that she worked for two weeks in 2008. (Tr. 43). Plaintiff stated that she did not file income taxes in 2008. (Tr. 44). Plaintiff testified that she has received unemployment benefits. (Tr. 45). Plaintiff stated that she has not received child support for her granddaughter since 2005. (Id.).

Plaintiff testified that her driver's license was suspended at the time of the hearing because she had not paid traffic fines. (Tr. 46).

Plaintiff stated that she was incarcerated in October of 2008 for a domestic violence charge. (Tr. 47). Plaintiff testified that the charge was dismissed and she was not on probation. (Id.).

Plaintiff stated that she smoked about a half package of cigarettes a day. (Id.). Plaintiff testified that she decreased her smoking from one package a day to half a package a day a couple years prior to the hearing. (Id.). Plaintiff stated that she drank once or twice a week. (Tr. 48).

Plaintiff testified that the most severe impairments that prevent her from working are her knee and foot impairments. (Id.). Plaintiff stated that she has difficulty standing, and that she is only able to stand for about ten minutes due to knee pain. (Id.). Plaintiff testified that she elevates her left leg for a couple hours to decrease swelling. (Tr. 49). Plaintiff stated that she is

able to sit for about thirty minutes before she has to change positions. (Tr. 50). Plaintiff testified that she can sit about fifteen minutes longer after changing positions before she has to stand. (Id.). Plaintiff stated that she usually watches television while lying in bed with her leg elevated. (Tr. 51).

Plaintiff testified that Dr. Timothy Shaver diagnosed her with osteoarthritis.[2] (Id.). Plaintiff stated that she had been experiencing leg pain and swelling prior to seeing Dr. Shaver. (Id.).

Plaintiff testified that she was able to walk about half of a block before she has to stop. (Tr. 52). Plaintiff stated that she was able to lift about twenty pounds. (Id.).

Plaintiff's attorney examined plaintiff, who testified that she also had problems with her hips, fingers, wrists, and shoulders. (Id.). Plaintiff stated that she was able to wash dishes for about ten minutes before her fingers started to cramp and become numb. (Tr. 54). Plaintiff testified that she has occasional difficulty gripping objects, and that she has dropped objects. (Tr. 55). Plaintiff stated that this occurs two to three times a day. (Tr. 56). Plaintiff testified that the day prior to the hearing, she dropped the comb she was using to comb her hair, and later dropped a glass of water. (Id.).

Plaintiff stated that she has difficulty bending to sweep or vacuum. (Tr. 57). Plaintiff testified that she experiences shoulder and back pain. (Id.). Plaintiff stated that she had not vacuumed, swept, or done laundry in approximately one year. (Tr. 58). Plaintiff testified that her

---

[2]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

twenty-year-old daughter vacuums, sweeps, cooks, and does the laundry. (Id.). Plaintiff stated that she is unable to stand long enough to cook. (Id.). Plaintiff testified that her impairments worsened approximately one year prior to the hearing. (Tr. 59).

Plaintiff stated that her other daughter shops for groceries for her. (Id.). Plaintiff testified that she rarely goes to the grocery store because it is "too much of a hassle." (Id.). Plaintiff stated that she last went to the grocery store about two months prior to the hearing. (Tr. 60).

Plaintiff testified that she does not participate in any social activities. (Id.). Plaintiff stated that she does not usually leave her home except to visit her daughter, who picks her up. (Id.). Plaintiff testified that she last visited her daughter the day prior to the hearing. (Id.). Plaintiff stated that she visits with her daughter about twice a month. (Tr. 61).

Plaintiff testified that she has to lie in bed due to her knee pain and back pain. (Id.). Plaintiff stated that she spends about four to five hours a day in bed. (Id.). Plaintiff testified that she goes to bed between 10:00 and 11:00 at night, and wakes up between 8:00 and 9:00 in the morning. (Id.). Plaintiff stated that she takes sleeping pills, which are effective. (Tr. 62).

The ALJ re-examined plaintiff, who testified that a friend drove her to the hearing. (Id.). Plaintiff stated that she had not driven in years. (Id.). Plaintiff testified that she drove on one occasion since her license was suspended because she had to pick up her daughter when she was sick. (Id.). Plaintiff stated that she received a citation for driving with no license, and that she was pulled over due to an expired tag. (Id.).

The ALJ next examined the vocational expert, Steve Benjamin. The ALJ asked Mr. Benjamin to assume a hypothetical claimant with plaintiff's background and the following limitations: occasionally lift up to twenty pounds, frequently lift up to ten pounds; stand and walk

six hours out of an eight-hour workday; sit six hours out of an eight-hour workday, with alternating sitting every thirty minutes; no climbing ladders, ropes, or scaffolds; no overhead reaching; no exposure to temperature of humidity extremes, vibrations, irritants such as chemicals or fumes, or hazards such as unprotected heights or being around dangerous moving machinery. (Tr. 65). Mr. Benjamin testified that the individual would be unable to perform plaintiff's past work. (Id.). Mr. Benjamin stated that the individual could perform other unskilled jobs, such as marker (3,570 jobs locally, 1,873,390 nationally); mail clerk (220 jobs locally, 137,350 nationally); order clerk, food and beverage (510 jobs locally, 248,030 jobs nationally); and polisher (410 jobs locally, 91,990 nationally). (Tr. 65-66).

The ALJ next asked Mr. Benjamin to reduce the lifting to ten pounds and the standing and walking to two hours out of an eight-hour workday. (Tr. 66). Mr. Benjamin testified that the individual could perform the order clerk position, which is sedentary. (Id.).

Mr. Benjamin testified that there would be no work available for an individual who required frequent and unscheduled rest breaks or an individual who had to elevate a leg to waist level. (Id.).

B.      **Relevant Medical Records**

Plaintiff presented to the emergency room at Via Christi Regional Medical Center on February 16, 2004, with complaints of lower back pain after being involved in a motor vehicle accident. (Tr. 497). Plaintiff was diagnosed with lumbar[3] sprain/strain. (Tr. 499).

---

[3]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information

Plaintiff presented to the emergency room on May 17, 2005, and July 19, 2005, with complaints of difficulty breathing due to asthma.  (Tr. 490, 493).  On both occasions, chest x-rays were negative.  (Tr. 492, 496).

Plaintiff presented to the emergency room with complaints of left shoulder pain on September 3, 2005.  (Tr. 488).  Plaintiff underwent an x-ray of the left shoulder, which revealed irregularity of the acromion[4] which may be in part due to degenerative change.  (Tr. 489).  A nondisplaced fracture could not be ruled out.  (Id.).

Plaintiff was admitted at Via Christi Regional Medical Center on December 21, 2005, due to COPD/[5]asthma exacerbation.  (Tr. 509).  Plaintiff's secondary diagnoses were tobacco abuse, iron deficiency, and alcohol abuse.  (Id.).  Plaintiff's chest x-ray was clear.  (Id.).  Plaintiff was treated with medication and her wheezing improved dramatically.  (Id.).  Plaintiff was instructed to follow up with her primary care provider.  (Id.).

Plaintiff was admitted on March 26, 2006, for asthma exacerbation.  (Tr. 625).  It was noted that plaintiff did not take medication, and had frequent admissions for the same acute asthma exacerbation.  (Id.).  Plaintiff reported that she smoked a half package of cigarettes a day, drank alcohol every other day, and smoked cocaine.  (Id.).  Plaintiff's acute asthma exacerbation was treated with corticosteroids and breathing treatments.  (Id.).  Plaintiff was also treated for

---

Systems for Lawyers, § 6:27 (1993).

[4]The lateral extension of the spine of the scapula that projects as a broad flattened process; it articulates with the clavicle.  Stedman's at 19.

[5]Chronic obstructive pulmonary disease ("COPD") is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Stedman's at 534.

alcoholism.  (Id.).

Plaintiff received occasional treatment at Hunter Health Clinic from 2006 through 2009 for various complaints including hypertension, asthma, bronchitis,[6] left knee pain, and abdominal pain.  (Tr. 534-37, 655-62, 677-79, 735-47).  On April 7, 2006, plaintiff had not been taking medication and had just been discharged from the hospital for asthma exacerbation and high blood pressure.  (Tr. 537).  Plaintiff was prescribed various medications for her complaints, including Advair,[7] Albuterol,[8] Singulair,[9] and Hydrochlorothiazide.[10]  (Tr. 536, 537, 658, 660, 661, 679).  Plaintiff's height was five-feet two-inches, and her weight ranged from 221 to 240.  (Tr. 536, 537, 657-62, 679, 736-38).

On June 8, 2006, plaintiff underwent an x-ray of the sternum, which was normal.  (Tr. 519).

On November 14, 2006, plaintiff saw James G. Henderson, M.D. for a consultative examination regarding complaints of joint pain and asthma.  (Tr. 538-42).  Plaintiff reported a one year history of bilateral shoulder and a five year history of knee pain, left greater than the right. (Tr. 538).  Plaintiff indicated that she injured her left shoulder in a motor vehicle accident.  (Id.). Plaintiff also reported a history of high blood pressure and shortness of breath.  (Id.).  Upon

---

[6]Inflammation of the mucous membrane of the bronchi.  Stedman's at 270.

[7]Advair is indicated for the treatment of asthma and COPD.  See Physician's Desk Reference ("PDR"), 1276 (63rd Ed. 2009).

[8]Albuterol is indicated for the treatment of COPD.  See PDR at 846.

[9]Singulair is indicated for the treatment of asthma.  See PDR at 2117.

[10]Hydrochlorothiazide is indicated for the treatment of hypertension.  See PDR at 643.

examination, Dr. Henderson noted rhonchi,[11] which were diminished with cough. (Tr. 539).

Plaintiff had thirty pounds of grip strength with the right hand and twenty pounds of grip strength in the left hand. (Id.). Pes planus[12] was noted. (Id.). Plaintiff had somewhat reduced range of motion of the shoulders, crepitation[13] to the left shoulder, and crepitation to both knees. (Id.). Otherwise, plaintiff had full range of motion of all joints without tenderness, redness, or effusion. (Id.). Plaintiff had no difficulty getting on and off the examining table, mild difficulty with heel and toe walking, moderate difficulty squatting and arising from the sitting position, and severe difficulty hopping. (Tr. 540). Dr. Henderson diagnosed plaintiff with hypertension, asthma, and arthralgias.[14] (Tr. 540-41). Dr. Henderson noted that plaintiff's blood pressure was poorly controlled and recommended follow-up medical management. (Id.). Dr. Henderson stated that plaintiff's examination pointed to mild inherent lung disease. (Id.). He recommended smoking cessation. (Id.). He noted that crepitation was appreciated to both knees and the left shoulder. (Id.). Dr. Henderson indicated that weight loss may be helpful. (Id.).

Plaintiff underwent x-rays of the left shoulder and left knee, which revealed no acute traumatic or intrinsic osseous[15] abnormalities. (Tr. 542).

Plaintiff saw Molly Allen, Psy.D., Licensed Psychologist, for a Mental Status Exam on

---

[11]An added sound with a musical pitch occurring during inspiration or expiration, heard on auscultation of the chest and caused by air passing through bronchi that are narrowed by inflammation. Stedman's at 1693.

[12]Flat feet. Stedman's at 1468.

[13]Noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions. Stedman's at 457.

[14]Pain in a joint. Stedman's at 159.

[15]Bony. Stedman's at 1387.

December 4, 2006. (Tr. 543-45). Plaintiff's complaints were listed as asthma, shoulder and knee pain, and problems with concentration. (Tr. 543). Plaintiff reported that she did not believe she had any problems with depression, and did not describe anxiety or other psychiatric symptoms. (Id.). Plaintiff complained of difficulty tracking and following, and appeared to be an undisciplined sort of person who did not put a lot of effort in to sustain concentration. (Id.). Plaintiff had never received any psychiatric care, medication, or counseling. (Id.). Dr. Allen noted that plaintiff provided inconsistent stories regarding why she no showed for her first appointment. (Tr. 544). Upon mental status exam, plaintiff avoided making a lot of eye contact, her mood and affect were subdued, and she tended to be sloppy with details. (Id.). Plaintiff showed no signs of a thought disorder or psychosis, appeared to be of about low average intelligence, and frequently requested that questions be repeated. (Tr. 545). With regard to plaintiff's credibility, Dr. Allen summarized that plaintiff was not very good with timeliness and had some features in her presentation that suggested she may be possibly overemphasizing some of her symptoms. (Id.). Dr. Allen found that plaintiff was able to understand and carry out simple instructions, although she may need extra reminders and cues. (Id.). Dr. Allen noted that plaintiff is pretty poor at attention and concentration, but it was not clear how much of that was willful and how much was innate. (Id.). Dr. Allen found that plaintiff may have a difficult time working alongside and for others as she may tend to shirk responsibilities to others. (Id.). Dr. Allen stated that plaintiff had shown an ability in the past to adapt to a work environment, but it appears that attendance and tardiness have been issues that have often been problems for her. (Id.). Finally, Dr. Allen found that plaintiff had the basic resources necessary to manage her finances. (Id.). Dr.

Allen indicated that her diagnoses would be adjustment disorder[16] not otherwise specified and rule out borderline intellectual functioning.[17] (Tr. 547).

On December 8, 2006, C.A. Parsons, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment. (Tr. 549-56). Dr. Parsons found that plaintiff could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; push or pull an unlimited amount; occasionally climb ladders, kneel, crouch, and crawl; reach overhead with the left arm a limited amount; and should avoid concentrated exposure to extreme cold and heat, humidity, and vibration. (Tr. 553).

On December 11, 2006, S. Douglas Witt, Ph.D., a state agency psychiatrist, completed a Psychiatric Review Technique. (Tr. 558-71). Dr. Witt expressed the opinion that plaintiff's impairments were not severe and resulted in mild limitations in plaintiff's activities of daily living and ability to maintain concentration, persistence, or pace. (Tr. 568).

Plaintiff saw Robert Frederic Greiner, D.O. for a consultative evaluation on May 21, 2007. (Tr. 573-76). Plaintiff's complaints were listed as asthma, rotator cuffs bilaterally, spur on foot, arthritis, high blood pressure, and hearing. (Tr. 573). Plaintiff was taking no prescription pain medication. (Id.). Upon physical examination, plaintiff was noted to be overweight and had a limp to the right. (Tr. 574). Wheeezing was noted, and plaintiff's breath sounds were mildly

---

[16]A disorder the essential feature of which is a maladaptive reaction to identifiable psychological stress, or stressors, that occurs within weeks of the onset of the stressors and persists for as long as six months. Stedman's at 567.

[17]Borderline intellectual functioning is defined as an IQ in the 71-84 range. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 684 (4th Ed. 1994).

decreased. (Id.). There was no limitation of joint movement and all joints were without tenderness, effusion, or redness. (Id.). Plaintiff had thirty pounds of grip strength in the right hand and twenty pounds of grip strength in the left hand. (Tr. 575). Plaintiff was able to pick up a coin, open a door, and fasten a button. (Id.). Plaintiff's motor function was normal in all four extremities, and sensation was intact. (Id.). Plaintiff had no difficulty getting on and off the examining table or with heel and toe walking. (Id.). Plaintiff had mild difficulty squatting and arising from the sitting position and hopping. (Id.). Dr. Greiner diagnosed plaintiff with hypertension, under excellent control; asthma, mild pulmonary impairment, smoking cessation and weight loss advised; hearing loss, able to hear a normal voice at ten feet; and arthralgias, with full range of motion of all joints tested and no paravertebral muscle spasm. (Tr. 575-76).

Plaintiff presented to the emergency room on March 29, 2008, with complaints of left knee pain and swelling after twisting her knee while getting off a bike. (Tr. 647-48). Plaintiff was diagnosed with left knee sprain/strain. (Tr. 653).

Plaintiff presented to the emergency room on April 24, 2008, with complaints of difficulty breathing. (Tr. 637). Plaintiff reported improvement after Albuterol breathing treatments. (Id.).

Plaintiff received emergency room treatment for a right thumb sprain on November 10, 2008. (Tr. 690).

Plaintiff saw Shawn R. Morrow, D.O. for a consultative evaluation on October 10, 2008. (Tr. 664-66). Plaintiff complained of asthma, rotator cuff injury to both arms, left knee pain, back pain, hip pain, and hand pain. (Tr. 664). Plaintiff reported that physical therapy provided mild relief. (Id.). Plaintiff was taking no pain medication. (Id.). Upon examination, plaintiff's gait

was antalgic,[18] limping to the left. (Tr. 665). Wheezes and mildly diminished breath sounds were noted. (Id.). Plaintiff had 11.6 pounds of grip strength with the right hand and 19.4 pounds of grip strength with the left hand. (Id.). Plaintiff had no limitation of joint movement and all joints were without tenderness, effusion, or redness. (Id.). Mild swelling of the left knee was noted. (Id.). Plaintiff had normal motor function in all four extremities, and sensation to light touch was intact. (Id.). Plaintiff had mild difficulty getting on and off the examining table, moderate difficulty with heel and toe walking, moderate difficulty squatting and arising from the sitting position, and severe difficulty hopping. (Tr. 666). Dr. Morrow diagnosed plaintiff with diffuse arthralgias and asthma. (Id.).

Plaintiff underwent x-rays of the left hip, lumbar spine, and chest on October 10, 2008. (Tr. 667). The left hip x-rays revealed moderate narrowing of the superior compartment of the hip joint but no spurring or erosive change; and minimal buttressing of the cortical surfaces of the femoral neck. (Id.). Plaintiff's lumbar spine x-ray revealed satisfactory vertebral height and alignment, with minimal narrowing of the lumbosacral disc space and minor lower lumbar facetal arthrosis. (Id.). Plaintiff's chest x-ray revealed no abnormalities. (Id.).

Plaintiff underwent x-rays of the left wrist on November 25, 2008, which were negative. (Tr. 685). X-rays of the left hand revealed degenerative changes with joint space narrowing but no acute fracture or dislocation. (Tr. 686). X-rays of the right hand revealed bony irregularity but no acute fracture or dislocation. (Tr. 687).

On January 16, 2009, Gerald Siemsen, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment. (Tr. 692-99). Dr. Siemsen expressed the

---

[18]A limp adopted so as to avoid pain on weight-bearing structures. Stedman's at 99.

opinion that plaintiff could occasionally and frequently lift or carry ten pounds; stand or walk two hours in an eight-hour workday; sit six hours in an eight-hour workday; push or pull an unlimited amount; occasionally climb, stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 693-96).

Plaintiff underwent x-rays of the knees on February 18, 2009, which revealed moderate-to-severe medial compartment narrowing involving both knees consistent with primary osteoarthritis of the knees. (Tr. 733). X-rays of the hands revealed osteoarthritic changes, but no convincing evidence for a concomitant inflammatory arthritis syndrome. (Tr. 732).

Plaintiff received treatment from Timothy Shaver, M.D. and Ruth Busch, MSN, ARNP, at the Arthritis and Rheumatology Clinic of Kansas from February 2009 through September 2009. (Tr. 702-24). On February 16, 2009, plaintiff presented for evaluation of bilateral knee pain, and arthralgia involving the shoulder girdle, hip girdle, and hands. (Tr. 712). Upon physical examination, Dr. Shaver noted scattered expiratory wheezes, full extension in both knees but significant crepitus bilaterally, soft tissue swelling in both knees, tender points in nine of eighteen locations, diminished deep tendon reflexes in the lower extremities, and intact strength. (Tr. 713-14). Dr. Shaver's impression was significant osteoarthritic involvement of both knees predominating in the medial compartment, and early osteoarthritis of the hands; history of sleep disturbance but technically falls short of meeting fibromyalgia criteria; and no convincing evidence for an inflammatory arthritis syndrome. (Tr. 714). Dr. Shaver prescribed Diclofenac[19] for

_____

[19]Diclofenac is indicated for the treatment of osteoarthritis and rheumatoid arthritis. See PDR at 2334.

plaintiff's joint symptoms, and recommended water exercise and further testing.  (Id.).

Plaintiff saw Ms. Busch on May 6, 2009, at which time plaintiff complained of difficulty with her knees, particularly her left knee.  (Tr. 710).  Plaintiff's left knee was swollen, was very tender with range of motion, and there was a lot of crepitus with range of motion.  (Id.).  Ms. Busch was able to ballot some fluid.  (Id.).  Plaintiff also complained about pain in her feet along the great toe bilaterally.  (Id.).  Ms. Busch noted a valgus deformity[20] on x-rays.  (Id.).  Ms. Busch's impression was osteoarthritis of the knees and hands; and trochanteric bursitis.[21]  (Id.).  Ms. Busch administered a steroid injection in the left knee.  (Id.).

Plaintiff saw Ms. Busch on May 15, 2009, at which time plaintiff reported that her knees were very swollen, although Ms. Busch indicated that she was unable to ballot any fluid out of the knees.  (Tr. 708).  Plaintiff complained of more swelling in the left knee, but Ms. Busch noted that both knees appeared the same.  (Id.).  Plaintiff had reasonable range of motion of both knees with a lot of tenderness and myofascial[22] tenderness throughout.  (Id.).  Ms. Busch diagnosed plaintiff with bilateral knee pain and fibromyalgia.  (Id.).  Ms. Busch prescribed Flexeril.[23]  (Id.).

On June 11, 2009, plaintiff complained of pain all over.  (Tr. 705).  Ms. Busch noted positive trigger points at nine of eighteen points.  (Tr. 706).  Plaintiff's foot motion was normal.

---

[20]Any joint in an extremity that is deformed such that the more distal of the two bones forming the joint deviates away from the midline, as in knock-knee.  Stedman's at 2085.

[21]Inflammation of the trochanteric bursa, part of the hip.  See Stedman's at 282.

[22]Relating to the fascia, or fibrous connective tissue, surrounding and separating the muscle tissue.  See Stedman's at 1272.

[23]Flexeril is a muscle relaxant indicated for the treatment of muscle spasms.  See PDR at 966.

(Id.).  Ms. Busch noted crepitus with range of motion of the knees.  (Tr. 705).  Ms. Busch's assessment was osteoarthritis of the knee and myofascial pain syndrome.  (Tr. 706).  Ms. Busch continued plaintiff's medications and counseled her regarding regular exercise, water exercises, and weight loss.  (Id.).

On September 16, 2009, Ms. Busch noted abnormal motion of the fingers, plaintiff was unable to make a tight fist, tenderness on palpation of both wrists, stiffness with range of motion of the lumbosacral spine, warmth of the knee, crepitus of the patella, abnormal knee motion.  (Tr. 703).  Ms. Busch's assessment was pain in the finger joints, wrist joint pain, hip joint pain, knee joint pain, asymmetrical polyarticular inflammation (rule out inflammatory arthritis), compression arthralgia, and lumbago.[24]  (Id.).  Ms. Busch recommended additional testing, along with regular exercise, abstinence from alcohol, abstinence from smoking, and weight loss.  (Tr. 703-04).

Plaintiff underwent an MRI of the right hand on September 17, 2009, which revealed capsular[25] thickening, with no active marginal erosions.  (Tr. 729).  An MRI of the right wrist revealed large capitate[26] geode/[27]erosion.  (Tr. 727).

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

---

[24]Pain in mid and lower back.  Stedman's at 1121.

[25]A membranous anatomic structure which envelops a joint.  Stedman's at 302.

[26]The largest of the carpal bones.  Stedman's at 301.

[27]A cystlike space observed radiologically in subarticular bone, usually in arthritic disorders.  Stedman's at 801.

2.     The claimant has not engaged in substantial gainful activity since February 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: degenerative joint disease left hip and knee; degenerative disc disease lumbar spine, status post left hand fracture, asthma, right wrist impairment (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift or carry 10 pounds occasionally and 10 pounds frequently.  She can stand or walk 2 of 8 hours in a workday.  She can sit for 6 of 8 hours in a workday.  She needs to alternate sitting/standing every 30 minutes.  She cannot perform climbing or overhead reaching.  She cannot be exposed to temperature or humidity extremes, vibrations, irritants such as chemicals, fumes, or gasses, or hazards such as unprotected heights or being around dangerous moving machinery.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on October 7, 1961 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act,

from February 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-16).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on April 4, 2006, March 21, 2007, and July 14, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on July 14, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 17).

# **Discussion**

## A.     **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry."

Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant

has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial

gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age,

education and work experience of a claimant are not considered in making the "severity"

determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff raises several claims related to the ALJ's RFC determination. Plaintiff first argues that the ALJ erred in evaluating the medical opinion evidence. Plaintiff next argues that the ALJ did not evaluate the effects of obesity on plaintiff's impairments. Plaintiff also contends that the ALJ failed to evaluate medial opinions of plaintiff's mental limitations when assessing plaintiff's RFC. Plaintiff finally argues that the ALJ failed to provide a narrative discussion describing how the evidence supported his RFC determination and that his RFC determination was not supported by substantial evidence.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift or carry 10 pounds occasionally and 10 pounds frequently. She can stand or walk 2 of 8 hours in a workday. She can sit for 6 of 8 hours in a workday. She needs to alternate sitting/standing every 30 minutes. She cannot perform climbing or overhead reaching. She cannot be exposed to temperature or humidity extremes, vibrations, irritants such as chemicals, fumes, or gasses, or hazards such as unprotected heights or being around dangerous moving machinery.

(Tr. 13).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and

others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

In this case, none of plaintiff's treating physicians provided opinions regarding plaintiff's work-related limitations. Although plaintiff underwent three consultative physical examinations. none of these physicians provided an opinion regarding plaintiff's ability to function in the workplace. The only physicians to express an opinion regarding plaintiff's functional limitations were two non-examining state agency physicians, Drs. Parsons and Siemsen.

On December 8, 2006, Dr. Parsons completed a Physical Residual Functional Capacity Assessment, in which he found that plaintiff could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; push or pull an unlimited amount; occasionally climb ladders, kneel,

crouch, and crawl; reach overhead with the left arm a limited amount; and should avoid concentrated exposure to extreme cold and heat, humidity, and vibration. (Tr. 553). On January 16, 2009, Dr. Siemsen completed a Physical Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff could occasionally and frequently lift or carry ten pounds; stand or walk two hours in an eight-hour workday; sit six hours in an eight-hour workday; push or pull an unlimited amount; occasionally climb, stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 693-96).

With respect to the opinion evidence, the ALJ stated as follows:

> As for the opinion evidence, note is taken of the report from May 2009 from Ruth Busch, MSN, ARNP, that the claimant was reporting that her knees were very swollen but the nurse was unable to ballot any fluid out of them. Additionally the claimant reported that the left had more swelling than the right but the nurse thought her knees looked the same.

(Tr. 15).

The ALJ did not discuss the opinions of Drs. Parsons or Siemsen. Further, the "opinion evidence" to which the ALJ referred is not opinion evidence. Rather, the ALJ simply pointed to objective findings from a single visit with the nurse practitioner in plaintiff's treating rheumatologist's office.

While it is true that Ms. Busch was unable to ballot any fluid out of plaintiff's knees on May 15, 2009, on that date Ms. Busch also noted tenderness in both of plaintiff's knees and myofascial tenderness throughout, and diagnosed plaintiff with fibromyalgia. (Tr. 708). On May 6, 2009, Ms. Busch was able to ballot some fluid out of plaintiff's left knee. (Tr. 710). Plaintiff's left knee was swollen, was very tender with range of motion, and there was a lot of crepitus with range of motion. (Tr. 710). Ms. Busch diagnosed plaintiff with osteoarthritis of the knees and

hands and trochanteric bursitis, and administered a steroid injection in the left knee at that time. (Id.). On plaintiff's initial visit in February 2009, Dr. Shaver noted scattered expiratory wheezes, significant crepitus bilaterally, soft tissue swelling in both knees, tender points in nine of eighteen locations, diminished deep tendon reflexes in the lower extremities. (Tr. 713-14). The ALJ did not discuss any of these objective findings. The ALJ did mention, in discussing the objective evidence, that Ms. Busch noted positive trigger points at nine of eighteen points on June 11, 2009, and that Ms. Busch noted swelling and stiffness in the fingers on September 16, 2009. (Tr. 14, 706, 703). Ms. Busch also noted crepitus of the patella, warmth of the knee, and abnormal knee motion on September 16, 2009. (Tr. 703).

The undersigned finds that the ALJ erred in determining plaintiff's RFC. The ALJ did not point to any evidence in support of his determination. The only physicians to express an opinion regarding plaintiff's functional limitations were non-examining state agency physicians. "[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000). The ALJ did not indicate the weight he was assigning to these opinions. To the extent the ALJ relied on these opinions, it does not constitute substantial evidence supporting the ALJ's decision. The state agency physicians provided their opinions in December 2006 and January 2009, prior to the time plaintiff began treatment with Dr. Shaver and Ms. Busch. Dr. Siemsen, therefore, did not have the benefit of the findings of Dr. Shaver and Ms. Busch.

The ALJ has the duty to develop the record, which includes developing the record as to the medical opinion of the claimant's treating physician. Higgens v. Apfel, 136 F. Supp.2d 971, 978 (E.D. Mo. 2001) (citing Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987). The ALJ is

required to re-contact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).

Dr. Shaver, plaintiff's treating rheumatologist, and Ms. Busch, have noted significant objective findings, particularly with respect to plaintiff's knees. They have also diagnosed plaintiff with fibromyalgia. These providers did not, however, provide an opinion regarding plaintiff's limitations. The ALJ should have further developed the record by contacting these providers to obtain evidence regarding plaintiff's ability to function in the workplace.

In addition, as plaintiff notes, the ALJ did not evaluate the effect of plaintiff's obesity on plaintiff's impairments. Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." Social Security Ruling 02-01p, 2000 WL 628049, *4 (S.S.A. 2002). In addition, adjudicators should "consider [obesity's] effects when evaluating disability." Id. Plaintiff, who is five-feet, two-inches tall, weighed between 221 and 240 pounds between 2006 and 2009. Plaintiff's weight would likely affect the severity of plaintiff's impairments, specifically plaintiff's knee impairment. Consequently, the ALJ should have discussed the effect of plaintiff's weight on her impairments.

Finally, plaintiff argues that the ALJ erred in failing to evaluate the impact of plaintiff's mental limitations in determining her RFC. Plaintiff, however, did not allege a mental impairment in her application, or during the administrative hearing. "The ALJ . . . [has] no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993).

Plaintiff points out that consultative psychologist Dr. Allen found that plaintiff had difficulty with attention and concentration. (Tr. 545). Dr. Allen, however, also found that plaintiff was possibly over emphasizing some of her symptoms and that her abilities to focus may be better than she was displaying. (Id.). The ALJ noted Dr. Allen's findings regarding plaintiff's credibility. (Tr. 15). The medical record does not support the presence of any mental limitations. Thus, the ALJ did not err in failing to include mental limitations when determining plaintiff's RFC.

In sum, the residual functional capacity determined by the ALJ is not supported by substantial evidence. The ALJ appeared to rely on the opinions of non-examining state agency physicians without indicating the weight he was assigning to these sources. In support of his decision, the ALJ pointed to isolated objective findings of Dr. Shaver and Ms. Busch, while ignoring findings supportive of plaintiff's claim. None of plaintiff's treating or examining physicians provided an opinion regarding plaintiff's ability to function in the workplace with her combination of impairments. Finally, the ALJ failed to evaluate the effect of plaintiff's obesity on her impairments. As a result, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to obtain medical evidence addressing plaintiff's ability to function in the workplace, and reassess plaintiff's residual

functional capacity.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.

Dated this <u>4th</u> day of December, 2012.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE